UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LIONEL WHITE, | CASE NO. 11-5536 RJB |
| Plaintiff, | ORDER ON THE MOTION TO DISMISS, MOTIONS FOR SUMMARY JUDGMENT, AND OTHER MOTIONS |
| v. | |
| UNITED STATES OF AMERICA, and PACIFIC SHIP REPAIR AND FABRICATION, INC., | |
| Defendants /Third Party Plaintiffs | |
| v. | |
| AMSEC LLC, | |
| Third Party Defendant. | |

This matter comes before the Court on the Plaintiff's Motion to Strike (Dkt. 54), Defendant United States of America's Motion to Dismiss (Dkt. 48), Pacific Ship Repair and Fabrication Inc.'s Motion for Summary Judgment Dismissing Plaintiff's Claims (Dkt. 51), Third-Party Defendant AMSEC, LLC's Motion for Summary Judgment (Dkt. 45), and to the extent

1 that one is made, Pacific Ship Repair and Fabrication Inc.'s motion for summary judgment

2 dismissing the United States' claims against it (Dkt. 58).  The Court has considered the pleadings

3 filed in support of and in opposition to the motions, oral argument held on 10 January 2013, and

4 the file herein.

5    Plaintiff Lionel White filed this case to recover for injuries he sustained at work after

6 tripping and falling while walking on the west wall of Puget Sound Naval Shipyard, Dry Dock 6.

7 Dkt. 16.  Now ripe is the Defendant United States' Motion to Dismiss, where it asserts that this

8 Court lacks subject matter jurisdiction over Plaintiff's claims against it because of the

9 discretionary function exception to Federal Tort Claims Act ("FTCA").  Dkt. 12.  Defendant

10 Pacific Ship Repair and Fabrication Inc. ("PacShip") moves for summary judgment on Plaintiff's

11 claims against it, arguing that if the United States' is immunized by the discretionary function

12 exception, as a contractor for the United States, it is entitled to the government contractor

13 defense.  Dkt. 51.  Defendant AMSEC moves for summary dismissal of the indemnity and

14 contribution cross claims asserted against it, arguing that there is no evidence that it was

15 negligent and because it paid workers' compensation benefits, it is immune from further liability.

16 Dkt. 45.

17    For the reasons set forth below, the discretionary function exception does not apply and

18 so the United States' motion (Dkt. 12) should be denied.  PacShip, accordingly, is not entitled to

19 the government contractor defense, and so its motion for summary judgment (Dkt. 51) should be

20 denied.  AMSEC's motion (Dkt. 45) should be granted because there is no evidence it was

21 negligent and so PacShip's cross claims for contribution and indemnity should be dismissed.  To

22 the extent that PacShip moves for summary dismissal of the United States' claims (made in

23

24

ORDER ON THE MOTION TO DISMISS,
MOTIONS FOR SUMMARY JUDGMENT, AND
OTHER MOTIONS- 2

1  PacShip's response to AMSEC's motion (Dkt. 58)) the motion should be denied without

2  prejudice for failing to follow Western District of Washington Rule of Civ. Pro. 7(d).

3  **I.   FACTS AND PROCEDURAL HISTORY**

4  **A.  BACKGROUND FACTS**

5  Puget Sound Naval Shipyard and Intermediate Maintenance Facility ("PSNS"),

6  established in 1891, is a major industrial facility for the maintenance, repair, and modernization

7  of the U.S. Navy Fleet.  Dkt. 50, at 2.  Employing over 10,500 civilians and a multitude of

8  contractors, operations at PSNS occur 24 hours a day, seven days a week, in and around the six

9  dry docks.  *Id.*

10  PSNS is a "high security, nuclear, military repair facility."  Dkt. 53, at 5.  Dry Dock 6 is

11  in the middle of the secure area, also known as the Controlled Industrial Area or ("CIA"), and is

12  not open to the public.  *Id.*  Special security clearances are required to enter, and access is

13  controlled by guards.  *Id.*  Visitors must receive clearances in advance and be escorted by

14  authorized personnel.  Dkt. 53, at 5-6.  "Any and all changes to the shipyard must be approved

15  by the appropriate Navy personnel so they can evaluate potential security risk and then assure

16  that such changes are carried out is a way that does not compromise security."  Dkt. 53, at 6.

17  PSNS's Dry Dock 6 is the largest dry dock, and the only dry dock in the Pacific capable

18  of berthing the Navy's nuclear aircraft carriers.  Dkt. 53, at 2.  It is surrounded on three sides by

19  the waters of Sinclair Inlet, and at its' south end is a caisson, or dam.  There can be a workforce

20  of over 4000 people a day on Dry Dock 6 at the height of production.  Dkt. 50, at 3.  It is over

21  1100 feet long, 180 feet wide, and 60 feet deep.  Dkt. 50, at 2.  "Encircling it is nearly one mile

22  of crane track, major utilities tunnels, services, dock access points, brows and ramps to support

23  the heavy industrial work on the ships."  Dkt. 50, at 2-3.  "The walking surface of the west wall

24

ORDER ON THE MOTION TO DISMISS,
MOTIONS FOR SUMMARY JUDGMENT, AND
OTHER MOTIONS- 3

1   of Dry Dock 6 is not a smooth surface." Dkt. 53, at 7.  There are many incongruities and

2   changes in height though out the length of the west wall, which is a work area that workers move

3   around on foot. Dkt. 53, at 7.  Crane tracks for the 170 ton capacity cranes are recessed into the

4   pavement, but are open and the flange way grooves are around three inches wide and an inch

5   deep. Dkt. 50, at 3.  There are many track switches and rail transfer points along these tracks.

6   *Id.*  "The areas around and in the dry dock are utilized for industrial operations and may include

7   electrical generators, transformers, compressors, tanks and other large pieces of equipment, all of

8   which require power cables, hoses and other services that are placed or anchored on the

9   pavement." *Id.*  The concrete and asphalt surfaces are worn down and damaged by "heavy

10  trucks, forklifts, and other heavy transportation vehicles which are constantly bringing supplies

11  and parts and machinery" to be moved onto the ship by crane. *Id.*  "Large blast and paint

12  equipment is used and containment structures are raised, anchored and then moved as work

13  progresses on the ship." *Id.*  There are steel plates and metal drains used for draining water off

14  the dock. Dkt. 53, at 8.  The surface also has other bolts and rebar that "are used or have been

15  used for equipment in connection with dry docking vessels." *Id.*  The walking surfaces of the

16  dry dock are constantly changing as phases of work are started and completed. Dkt. 49, at 4.

17  Although it is repaved, according to the United States, "[i]t would be impossible to move all of

18  this heavy equipment and perform the work necessary on the ship in dock and maintain the area

19  in a completely trip hazard free condition." Dkt. 49, at 4.

20      Code 106 is the department at PSNS that is responsible for safety within the shipyard.

21  Dkts. 49 and 53, at 6.  They conduct daily inspections of the vessels under repair as well as the

22  other work areas of the shipyard. *Id.*  "Code 106 personnel are responsible for identifying and

23  addressing any safety issues or unsafe conditions found within the shipyard." Dkt. 53, at 6.  This

24

ORDER ON THE MOTION TO DISMISS,
MOTIONS FOR SUMMARY JUDGMENT, AND
OTHER MOTIONS- 4

1  includes the walking surface on the walls of Dry Dock 6.  *Id.*  If a hazardous condition is found

2  anywhere but aboard the ship, such as a common area, the Navy will address and correct such

3  hazard.  *Id.*  PacShip asserts that contractors such as it and AMSEC "have no control or authority

4  over, or ability to make any change to, any common area within PSNS."  *Id.*  If a contractor

5  believes a safety issue exists in the common area, it can report this to Code 106, and Code 106

6  will "evaluate the condition and make their own decision whether such condition constitutes an

7  actionable safety hazard or requires remediation."  *Id.*

8        The United States acknowledges that the heavy industrial area around Dry Dock 6 cannot

9  be made free of all safety hazards.  Dkt. 49, at 2.  "PSNS uses paint to mark certain hazards on

10  the walking surface, such as crane tracks, but it is impractical to mark all possible trip hazards

11  because the dry dock would then resemble a 'leopard' print, thereby negating the effect of such

12  markings."  Dkt. 53, at 8.  Accordingly, employees are given training and daily safety briefings

13  of the "need to 'watch your step' and to be on the constant lookout for tripping hazards."  Dkt.

14  53, at 8.  "In addition to the constant reinforcement of warnings, nobody is allowed to work [on

15  Dry Dock 6] without appropriate safety equipment" including steel toed shoes or boots, safety

16  glasses, and hard hats.  Dkt. 49, at 3.

17        In 2007, Defendant PacShip was awarded a "Multiple Award Contract" to perform repair

18  and maintenance work on U.S. Navy vessels.  Dkt. 53, at 3.  In September of 2008, PacShip was

19  "awarded a contract pursuant to the Multiple Award Contract to perform 'habitability' work

20  aboard the U.S.S. EMORY S. LAND."  *Id.,* at 4.

21        One month later, PacShip subcontracted with Third-Party Defendant AMSEC, LLC to

22  perform certain work on the LAND.  *Id.*  PacShip and AMSEC had been instructed by the Navy

23  to use a specific area of the dock for their work trailers, toolboxes, and supplies.  Dkt. 55-1 at 10-

24

1   12.  Employees had to walk on Dry Dock 6 between the Conex boxes (which are large trailers)

2   and the LAND.  *Id.*

3         On December 15, 2008, Plaintiff was working for AMSEC on Dry Dock No. 6.  Dkt. 16.

4   Plaintiff was assigned to the fire watch.  *Id.*  Around 6:15 a.m., he picked up a large fire

5   extinguisher and walked along the west wall toward his assigned station aboard the U.S.S.

6   EMORY S. LAND.  Dkt. 42-1, at 33-35.  It was dark.  Dkt. 42-1, at 36.  Near the gangway,

7   Plaintiff felt his foot stop, and fell, injuring his shoulder.  *Id.*  He states that he "was just walking

8   along there at a normal pace and put [his] foot out on the next step and it stopped and down [he]

9   went."  Dkt. 42-1, at 38.  Plaintiff states that he looked around and believed that he tripped on a

10  bolt or "stud" embedded in the walking surface which was over ¼ of an inch in height.  Dkt. 42-

11  1, at 38 and 40.  As a result of his fall, Plaintiff's states that his right rotator cuff was torn.  Dkt.

12  40-1, at 6.

13        On the day of his injury, Plaintiff was a 64 year old retired PSNS worker, 5'7" tall and

14  weighed 276 pounds.  Dkt. 42-1, at 24.  He had surgery on his big toe less than two weeks before

15  his accident, had left knee pain, and a leg length discrepancy which caused an alteration in his

16  gait.  Dkt. 41-1, at 11-16.  He also suffered from blurry vision and a loss in sensation in both feet

17  from uncontrolled diabetes.  Dkt. 42-1, at 25-27.  He was colorblind.  Dkt. 42-1, at 2.

18        At the time of Mr. White's accident, between 1,000 to 2,000 people walked on the west

19  wall of Dry Dock 6 multiple times each day.  Dkt. 53, at 7.  Other than this incident, there is no

20  evidence in the record that any other person reported the bolt.  Dkt. 53, at 7.  According to

21  AMSEC's safety manager, the bolt appeared to have been cut later in the day of Mr. White' fall,

22  or the following day.  Dkt. 55-1, at 31. Another of AMSEC's employees, William Duty, who

23

24

1   was a foreman, testified that he thought that the bolt that caused Plaintiff's fall was not removed.

2   Dkt. 47-7, at 13.  (There is no evidence in the record of who cut the bolt, if it was cut.)

3          A few days before Plaintiff's fall, Mr. Duty tripped on some bolts embedded in Dry Dock

4   6.  Dkt. 47-7, at 9.  The bolts were about 40 yards away from the bolt that Plaintiff thinks he

5   tripped over.  *Id.,* at 11.  Mr. Duty was reading blue prints and not watching where he was

6   walking.  *Id.,* at 12.  It is unclear whether Mr. Duty reported his tripping incident prior to

7   Plaintiff's fall.

8          Plaintiff filed a workers' compensation claim under the Longshore and Harbor Workers

9   Compensation Act ("LHWCA") against his employer AMSEC.  Dkt. 67-1, at 9.  He received a

10  lump sum payment of $30,000, a monthly payment of $643.11 for 84 months, and all of his

11  medical expenses associated with his shoulder injury.  Dkt. 67-1, at 9.

12      **B.  PROCEDURAL HISTORY**

13          Plaintiff filed his Amended Complaint on November 30, 2011.  Dkt. 16.  He asserts a

14  claim for negligence against the United States under the FTCA.  *Id.*  Plaintiff makes a negligence

15  claim against PacShip, and alleges that Pacship breached its contractual obligation to ensure a

16  safe work place, causing Plaintiff's injuries.  *Id.*  The United States has made a cross claim for

17  contractual and equitable indemnity against PacShip.  Dkt. 19.  PacShip has asserted a cross

18  claim against the United States for contractual indemnity and makes a third party claim against

19  AMSEC for contractual indemnity, equitable indemnity, and/or contribution.  Dkt. 24.

20          On November 6, 2012, Plaintiff's motion for summary dismissal of Defendants' defense

21  of comparative fault was denied.  Dkt. 44.  The Order found that Defendants had "shown that

22  there are issues of fact as to whether Plaintiff's medical conditions caused his fall and whether he

23

24

1    was also comparatively at fault for choosing to work that day and failing to inform his supervisor

2    of his physical limitations." *Id.*

3        The bench trial is set to begin on February 19, 2013.

4    **C.  PENDING MOTIONS**

5        In its pending motion, the United States argues that the FTCA claim against it should be

6    dismissed because the Navy's management of tripping hazards at Dry Dock 6 involved

7    discretionary judgment and choice.  Dkts. 48 and 66.  It argues that the Navy's decision on how

8    to handle tripping hazards on the dry dock involved the type of public policy considerations that

9    the discretionary function exception to the FTCA was designed to shield and so the claims

10   asserted against it should be dismissed.  *Id.*

11       In his Response, Plaintiff first moves to strike the Declarations of Carol Sehmel (Dkt.49)

12   and Randy D. Corbell (Dkt. 50).  Dkt. 54.  He then opposes the Motion to Dismiss, arguing that

13   1) state law, the Occupational Health and Safety Act ("OSHA"), and published scientific

14   standards exist to protect an invitee from unnecessary danger, 2) Plaintiff was an invitee and both

15   the United States and PacShip owed him a duty to protect him from unnecessary danger, 3)

16   eradicating the offending bolt was easy to do, 4) the United States did not have discretion to

17   disregard state law, OSHA, and safety regulations and standards designed to protect the public,

18   and 5) sloppy or substandard inspection and maintenance cannot be a policy decision.  *Id.*

19       PacShip moves for summary dismissal of Plaintiff's claims against it, arguing that where

20   the discretionary function exception applies to liability on the part of the government, it is

21   entitled to the government contactor defense.  Dkts. 51 and 64.

22       Plaintiff opposes the motion, and argues that the discretionary function exception does

23   not apply, so PacShip cannot avail itself of the defense.  Dkt. 56. Plaintiff argues that even if the

24

1    discretionary function exception applies, PacShip had "nondelegable duties under state law to

2    provide a reasonably safe workplace for subcontractor's employees," an obligation reaffirmed in

3    PacShip's contract with the United States.  *Id.*

4          AMSEC moves for summary judgment of the third party indemnity and or contribution

5    claims asserted against it by PacShip.  Dkts. 45 and 63.  (Plaintiff did not make a claim against

6    AMSEC, presumably because he collected worker's compensation under LHWCA).  AMSEC

7    argues that the LHWCA immunizes it from all tort claims arising from Plaintiff's work-related

8    injury, whether from Plaintiff or third parties.  Dkt. 45.  AMSEC argues further that the Court

9    should dismiss the contractual indemnity claim because AMSEC and PacShip entered a mutual

10   release of all claims.  *Id.*

11         PacShip opposes AMSEC's motion arguing that:  1) maritime, not Washington law

12   applies, so a claim for equitable indemnity exists, 2) the LHWCA does not bar PacShip's claims

13   for equitable indemnity and breach of an independent duty owed to it by AMSEC, 3) the

14   LHWCA does not bar PacShip's claim for contractual indemnity because AMSEC agreed to

15   indemnify PacShip for injury claims arising from its negligence under their written subcontract,

16   4) the release does not waive indemnity claims for personal injury because the language does not

17   clearly include such claims and the intent of the parties was not to do so, PacShip cannot be

18   deemed to have released a claim that AMSEC was contractually obligated to report to PacShip,

19   but failed to do, and 5) PacShip seeks indemnity against AMSEC on the identical basis that the

20   United States seeks indemnity against PacShip; PacShip agrees with the reasons stated by

21   AMSEC that the evidence in the case does not support a negligence finding based on the actions

22   or inaction of AMSEC employee Bill Duty, which is the sole basis of the United States'

23   indemnity claim; if the Court is inclined to grant summary judgment in favor of AMSEC on this

24

1   ground, summary judgment should also be entered against the United States on its indemnity

2   claim against PacShip as such a ruling would constitute the law of the case, rendering the United

3   States' claim moot. Dkt. 58. PacShip further states that if the United States' Motion to Dismiss

4   and its Motion for Summary Judgment are granted, AMSEC's motion should be granted

5   "because there would be nothing to recover from AMSEC." Dkt. 58.

6           **D. ORGANIZATION OF OPINION**

7      This opinion will first address Plaintiff's Motion to Strike (Dkt. 54), then the United States'

8   Motion to Dismiss (Dkt. 48), PacShip's Motion for Summary Judgment (Dkt. 51), and lastly

9   AMSEC's Motion for Summary Judgment (Dkt. 45), and to the extent that it makes one,

10   PacShip's motion (Dkt. 58) to have the United States' claims against it dismissed.

11               **II.**      <u>**DISCUSSION**</u>

12      **A. PLAINTIFF'S MOTION TO STRIKE**

13      Plaintiff moves to strike the Declarations of Carol Sehmel (Dkt.49) and Randy D. Corbell

14   (Dkt. 50), arguing that the United States failed to disclose these witnesses. Dkt. 54.

15      The United States points out that Ms. Sehmel was disclosed as a witness (in her role as

16   Navy safety personnel) and her deposition had been tentatively scheduled for October 16, 2012,

17   but was postponed by agreement. Dkt. 66. It argues that Mr. Corbell's declaration was offered

18   for the limited purpose of why the Navy had not adopted the ASTM standard on which

19   Plaintiff's experts rely. *Id.*

20      Plaintiff's motion to exclude the Declaration of Ms. Sehmel (Dkt. 49) should be denied.

21   Parties contemplated taking her deposition. Plaintiff cannot now complain he was unaware of

22   her as a witness.

23

24

ORDER ON THE MOTION TO DISMISS,
MOTIONS FOR SUMMARY JUDGMENT, AND
OTHER MOTIONS- 10

1    Plaintiff's motion to exclude the Declaration of Mr. Corbell (Dkt. 50) should be granted,

2    in part.  His Declaration should not be excluded in so far as it provides general background

3    information on PSNS.  For the purposes of this motion alone, it should be excluded in all other

4    respects because he was not fully disclosed.

5    **B.  MOTION TO DISMISS - STANDARD**

6    A complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) if, considering the factual

7    allegations in the light most favorable to the plaintiff, the action: (1) does not arise under the

8    Constitution, laws, or treaties of the United States, or does not fall within one of the other

9    enumerated categories of Article III, Section 2, of the Constitution; (2) is not a case or

10   controversy within the meaning of the Constitution; or (3) is not one described by any

11   jurisdictional statute.  *Baker v. Carr*, 369 U.S. 186, 198 (1962); *D.G. Rung Indus., Inc. v.*

12   *Tinnerman*, 626 F.Supp. 1062, 1063 (W.D. Wash. 1986); *see* 28 U.S.C. §§ 1331 (federal

13   question jurisdiction) and § 1346 (United States as a defendant).  When considering a motion to

14   dismiss pursuant to Rule 12(b)(1), the court is not restricted to the face of the pleadings, but may

15   review any evidence to resolve factual disputes concerning the existence of jurisdiction.

16   *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), *cert. denied*, 489 U.S. 1052

17   (1989); *Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983).

18   **C.  UNITED STATES' MOTION TO DISMISS - FTCA AND THE**
     **DISCRETIONARY FUNCTION EXCEPTION**
19
     The United States, as sovereign, is immune from suit unless it consents to be sued.  *See*
20
     *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Cato v. United States*, 70 F.3d 1103, 1107
21
     (9th Cir. 1995).  The FTCA is a limited waiver of sovereign immunity, rendering the United
22
     States liable for certain torts of federal employees.  *See* 28 U.S.C. § 1346(b).  The FTCA
23
     provides,
24

ORDER ON THE MOTION TO DISMISS,
MOTIONS FOR SUMMARY JUDGMENT, AND
OTHER MOTIONS- 11

> Subject to the provisions of chapter 171 of this title, the district courts, . . ., shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  Among the exceptions to the FTCA waiver of sovereign immunity is the "discretionary function exception."  It excludes:

> Any [§ 1346] claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  "The discretionary function exception insulates certain governmental decision-making from judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *Myers v. U.S.*, 652 F.3d 1021, 1028 (9th Cir. 2011)(*internal citations omitted*).  "The government bears the burden of proving that the discretionary function exception applies."  *Id.*  Additionally, "[t]he FTCA was created by Congress with the intent to compensate individuals harmed by government negligence, and as a remedial statute, it should be construed liberally, and its exceptions should be read narrowly."  *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir. 2008).

A two step test is used to determine whether the discretionary function applies.  *Terbush*, at 1129 (*citing Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)).  In the first step, the court determines "whether challenged actions involve an element of judgment or choice."  *Id*. (*quoting Berkovitz*, at 536).  If the challenged actions do involve an element of judgment or

ORDER ON THE MOTION TO DISMISS,
MOTIONS FOR SUMMARY JUDGMENT, AND
OTHER MOTIONS- 12

1   choice, then the court turns to the second step in the test.  *Id.*  The second step requires the court

2   to decide "'whether that judgment is of the kind that the discretionary function exception was

3   designed to shield,' namely, 'only governmental actions and decisions based on considerations of

4   public policy.'"  *Terbush,* at 1130 (*quoting Berkovitz,* at 536-37).  The exception applies even if

5   the decision is an abuse of discretion.  *Id.*  Each of the steps will be examined below.

6                1.   Whether Challenged Actions Involved an Element of Judgment or Choice?

7            In the first step, the court determines "whether challenged actions involve an element of

8   judgment or choice."  *Terbush,* at 1130 (*quoting Berkovitz,* at 536-37).  Under this step, the

9   "nature of the conduct, rather than the status of the actor" is examined.  *Id.* "The discretionary

10  element is not met where 'a federal statute, regulation, or policy specifically prescribes a course

11  of action for an employee to follow.'" *Id.* (*quoting Berkovitz,* 486 U.S. at 536).  The inquiry ends

12  if there is such a statute or policy directing mandatory and specific action because there can be

13  no element of discretion when an employee "has no rightful option but to adhere to the

14  directive."  *Id.*

15           Here, the Navy's management of tripping hazards on Dry Dock 6 involved an element of

16  judgment or choice.  There is no federal statute, regulation, or policy which specifically required

17  the offending bolt be cut or prescribes another course of action for an employee to follow here.

18  Plaintiff argues that under state law, published scientific standards, and a provision of the

19  Occupational Health and Safety Act ("OSHA"), the Navy had no discretion on how to handle the

20  bolt.  Each of these shall be considered.

21           Plaintiff's argument that under state law the Navy did not have discretion to make

22  decisions regarding tripping hazards on Dry Dock 6 is unavailing.  For purposes of the

23  discretionary functionary exception, whether a federal employee has discretion in their decision

24

1   making is determined by looking to federal law, not state law. *See Terbush,* at 1130 (*quoting*

2   *Berkovitz*, at 536)(holding that the first step is not met where "'a federal statute, regulation, or

3   policy specifically prescribes a course of action for an employee to follow'").

4         Plaintiff points to the American Society of Testing and Materials ("ASTM") F1637-01,

5   subpart 5.2, requiring that changes in levels of walkway surfaces of less than ¼ inch in height

6   may be made without edge treatment, but changes in levels between ¼ and ½ shall be beveled

7   with a slope, as a source which required mandatory action by the Navy.  Dkt. 54, at 16.  Plaintiff

8   offers two expert opinions that state that F1637-01 applies.  *Id.*  While it is true that "a safety or

9   engineering standard operates to remove discretion under the FTCA when it is embodied in a

10   specific and mandatory regulation or statute which creates clear duties incumbent upon the

11   governmental actors," *Kennewick Irr. Dist. v. U.S.*, 880 F.2d 1018 (9th Cir. 1989), Plaintiff has

12   failed to point to a single federal regulation or statute which contains ASTM F1637-01, subpart

13   5.2 (or any like standard).  There is no evidence that the Navy ever adopted this set of standards

14   for use on the dry docks, (particularly those dry docks that repair nuclear aircraft carriers) in "a

15   specific mandatory governmental policy duly adopted under authority delegated by statute or

16   regulation." *Id.*  Furthermore the area involved was not a "walkway," but was an industrial area

17   where people working there had to walk.  It was not a designated path, walk, aisle, passageway

18   or walkway.

19         As a further source of a claimed mandatory course of action regarding the bolt, Plaintiff

20   points to a provision of federal law:  OHSA, which provided in 2010:

21         The provisions of this section shall apply to ship repairing . . .
            (a) Good housekeeping conditions shall be maintained at all times.

22             Adequate aisles and passageways shall be maintained in all work areas.
            All staging platforms, ramps, stairways, walkways, aisles, and

23             passageways on vessels or dry docks shall be kept clear of all tools,
            materials, and equipment except that which is in use, and all debris such as

24

ORDER ON THE MOTION TO DISMISS,
MOTIONS FOR SUMMARY JUDGMENT, AND
OTHER MOTIONS- 14

welding rod tips, bolts, nuts, and similar material.  Hose and electric conductors shall be elevated over or placed under the walkway or working surfaces or covered by adequate crossover planks.
(b) All working areas on or immediately surrounding vessels and dry docks, graving docks, or marine railways shall be kept reasonably free of debris, and construction material shall be so piled as not to present a hazard to employees.

29 C.F.R. 1915.91(2010).  Plaintiff argues that a bolt sticking out of a walking surface more than a ¼ an inch violates this standard.  Dkt. 54.  The plain language of the OHSA provision does not support his position.  It requires "good housekeeping," but makes no mention of required action on bolts which are embedded in the surface of the pavement.  The one reference to bolts is in the context of "bolts" and "nuts," giving rise to the inference that the "bolts" referred to are not those sunk into the concrete.  This law is not a basis to conclude that the Navy had no discretion in how to handle tripping hazards on the dry dock, other than loose material.

Plaintiff further references OSHA's requirement regarding inspections, to be conducted at least once a year, including a "trip and fall inspection" of the area where Plaintiff fell.  This reference does not point to specific action the Navy must take in regard to the bolt or other items on the dock that may cause someone to fall.

Accordingly, there being no statute or policy directing mandatory and specific action regarding tripping hazards on the dry dock, or specifying time for such action, the court must continue to the second step of the discretionary function exception analysis.  *Myers,* at 1028.

2.   Whether the Judgment is of the Kind that the Discretionary Function Exception was Designed to Shield – Decisions Based on Considerations of Public Policy?

The second step requires the court to decide "'whether that judgment is of the kind that the discretionary function exception was designed to shield,' namely, 'only governmental actions and decisions based on considerations of public policy.'" *Terbush,* at 1130 (*quoting Berkovitz,* at

1   536-37.)  In this context, public policy has been understood to include decisions "grounded in

2   social, economic, or political policy."  *Terbush,* at 1130 (*quoting Varig,* at 814).

3       Plaintiff argues that the United States violated the standard Washington negligence test.

4   Washington defines "Negligence" as: "the failure to exercise ordinary care.  It is the doing of

5   some act that a reasonably careful person would not do under the same or similar circumstances

6   or the failure to do some act that a reasonably careful person would have done under the same or

7   similar circumstances."  Washington Pattern Jury Instructions 10.01.  Further, "Ordinary Care"

8   in Washington is defined as "the care a reasonably carful person would exercise under the same

9   or similar circumstances."  Washington Pattern Jury Instructions 10.02.

10      The Navy has shown that its decisions on how to generally handle the tripping hazards on the

11  dry dock are judgments susceptible to considerations of public policy, but has failed to show how

12  that policy applies to ordinary care, and this particular accident.  The Navy points out that the

13  manner in which it has decided to address dangers on Dry Dock 6 - using warnings, requiring

14  safety equipment, and using a system of reports and inspections, etc., - was chosen over adopting

15  rigid standard designs for a smooth and level walkway (like those found in ASTM 1637-01).

16  The Navy argues that providing a level dry dock would require a redesign of the crane system

17  and constant repaving of the dock which would significantly slow (or could stop) all work on the

18  dock.  The Navy maintains that such actions would occur a great taxpayer expense and may

19  impact the readiness of the Navy's fleet.  It, however, appears to exaggerate the response

20  required.  Pointing to the readiness of the Navy's fleet is too general to be helpful in determining

21  whether discretionary function should apply here.  The Navy has failed to show that dealing with

22  this bolt is a decision that is "grounded in social, economic, or political policy," or that its actions

23  relative to this bolt satisfied the duty of ordinary care.  *Terbush,* at 1130.  The United States has

24

1  not shown that the discretionary function exception applies.  The United States' Motion to

2  Dismiss (Dkt. 48) should be denied.

3  **D.  MOTION FOR SUMMARY JUDGMENT – STANDARD**

4  Summary judgment is proper only if the pleadings, the discovery and disclosure materials

5  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

6  movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

7  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

8  showing on an essential element of a claim in the case on which the nonmoving party has the

9  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

10  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

11  for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

12  (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

13  metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

14  material fact exists if there is sufficient evidence supporting the claimed factual dispute,

15  requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

16  *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

17  *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

18  The determination of the existence of a material fact is often a close question.  The court

19  must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

20  e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.*

21  *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

22  of the nonmoving party only when the facts specifically attested by that party contradict facts

23  specifically attested by the moving party.  The nonmoving party may not merely state that it will

24

ORDER ON THE MOTION TO DISMISS,
MOTIONS FOR SUMMARY JUDGMENT, AND
OTHER MOTIONS- 17

1    discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

2    to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

3    Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

4    be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### E.   PACSHIP'S MOTION FOR SUMMARY JUDGMENT DISMISSING PLAINTIFF'S CLAIMS

        Plaintiff asserts state law claims against PacShip:  negligence and breach of contract (for

failing in its contractual obligation to ensure a safe work place, causing Plaintiff's injuries).  Dkt.

16.  PacShip argues that pursuant to *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988), it

is entitled to share in the United States' immunity from suit under the discretionary function

exception under the government contractor defense.  Where the United States does not have

discretionary function exception immunity, PacShip can not avail itself of the government

contractor defense.  *Id.*  Here, the United States has not shown that the discretionary function

exception applies.  PacShip's motion for summary judgment (Dkt. 51), based on the government

contractor defense, should be denied.

        (PacShip points out that Plaintiff has failed to point to any legal duty it owed him that is

not related to the bolt.  Dkts.  51 and 64.  It notes that it is undisputed that PacShip had no duty to

inspect the area Plaintiff fell.  Further, there is no evidence it had any control over that area or

had authority to change the surface of the dry dock.  *Id.*  PacShip does not move for summary

judgment on this basis, however.)

### F.   AMSEC'S MOTION FOR SUMMARY JUDGMENT

        PacShip makes claims against AMSEC for contribution and indemnity.  AMSEC moves

for summary dismissal of those claims.  Dkts. 45 and 63.

1    AMSEC's Motion for Summary Judgment (Dkt. 45) should be granted.  Parties do not

2  dispute that in order to maintain its contribution and/or indemnity claims against AMSEC,

3  PacShip must show that AMSEC was in some manner negligent.  PacShip states that it makes its

4  claims on the identical basis that the United States seeks indemnity against PacShip.  Dkt. 58.  It

5  states that it agrees with AMSEC that the evidence in the case does not support a negligence

6  finding based on the actions or inaction of AMSEC employee Bill Duty, which is the sole basis

7  of the United States' indemnity claim.  Dkt. 58.  AMSEC's remaining arguments need not be

8  addressed.  All claims against AMSEC should be dismissed.

9    To the extent that PacShip seeks summary dismissal of the United States' indemnity

10  claim asserted against it (Dkt. 58), PacShip's motion should be denied without prejudice.  While

11  the motion may have merit, pursuant to Western District of Washington's Rule of Civil

12  Procedure 7(d)(3), dispositive motions are to be noted no earlier than the fourth Friday after

13  filing.  This motion, to have the United States' claims against PacShip dismissed, appear in

14  PacShip's response to AMSEC's motion (Dkt. 58).  Although PacShip indicates that the United

15  States is aware of the motion, in the interests of due process, PacShip's motion to have the

16  United States' claim against it dismissed should not be granted.

17  **E.  CONCLUSION**

18    Plaintiff's claims asserted under the FTCA against the United States remain.  Although

19  doubtful, Plaintiff's and the United States' claims against PacShip also remain.  All claims

20  against AMSEC should be dismissed.

21  **III.    ORDER**

22    Therefore, it is hereby **ORDERED** that:

23

24

1       •   Plaintiff's Motion to Strike (Dkt. 54) is **DENIED** as to the Declaration of Carol

2           Sehmel and **DENIED, IN PART, AND GRANTED, IN PART,** as to the

3           Declaration of Randy D. Corbell.

4       •   United States of America's Motion to Dismiss (Dkt. 48) **IS DENIED;**

5       •   Pacific Ship Repair and Fabrication Inc.'s Motion for Summary Judgment

6           Dismissing Plaintiff's Claims (Dkt. 51) **IS DENIED**;

7       •   Third-Party Defendant AMSEC, LLC's Motion for Summary Judgment (Dkt. 45)

8           **IS GRANTED**; the claims against it **ARE DISMISSED;** and

9       •   To the extent that Pacific Ship Repair and Fabrication Inc. makes a Motion for

10          Summary Judgment Dismissing the United States' Claims against it (Dkt. 58), it

11          **IS DENIED WITHOUT PREJUDICE.**

12      The Clerk is directed to send uncertified copies of this Order to all counsel of record and

13 to any party appearing pro se at said party's last known address.

14      Dated this 17th day of January, 2013.

15

16

17                  ROBERT J. BRYAN
                   United States District Judge

18

19

20

21

22

23

24